# In the United States Court of Federal Claims

No. 17-422
Filed: May 28, 2019

|  |  |  |
|---|---|---|
| COASTAL PARK LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Contract Interpretation; Damages; Clauses |
| | ) | Limiting Available Damages; Covenant of |
| THE UNITED STATES, | ) | Good Faith and Fair Dealing. |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

*G. Alexander Novak*, Cedarhurst, New York, for plaintiffs.

*Stephen Carl Tosini*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION

**FUTEY**, *Senior Judge*

This case is before the Court on defendant's motion to partially dismiss plaintiff's amended complaint, which was filed on May 8, 2017, pursuant to rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). Defendant filed its motion on July 3, 2017. Plaintiff filed a response on August 14, 2017, and defendant filed its reply on August 28, 2017.

Plaintiff seeks damages related to the cancellation of a contract to purchase a former Coast Guard housing complex. In its motion to partially dismiss, defendant contends that a clause in the parties' contract limits plaintiff's damages to the return of the earnest money plaintiff paid in anticipation of closing.

The matter is now ripe for disposition.

## I.      BACKGROUND

### a.  Factual Background

On September 8, 2016, the General Services Administration ("GSA") accepted bids in response to Invitation for Bids ("IFB") No. PEACH416017001. IFB at 2. The IFB contemplated the sale of Coastal Park, a former Coast Guard housing complex in Elizabeth City, North Carolina for a minimum all-cash bid of $2,000,000.00. *Id.* at 3, 14. To submit a bid, offerors were required to make a deposit of $100,000. *Id.* at 14.

The IFB contemplated a closing date "**forty-five (45)** calendar days after the acceptance of the Bid." *Id.* at 12 (bolding in original). The Government "reserve[d] the right to extend the closing date for a reasonable amount of time." *Id.* The Government also "reserve[d] the right to refuse a Purchaser's request for extension of closing." *Id.* And, the IFB provided that, "[e]xcept for delayed closing caused solely by the Government or forced [sic] majeure events, any change to the closing date . . . is subject to written approval by the Government." *Id.*

Within ten days of the Government accepting a bid, a successful offeror was required to submit an additional deposit so that the sum of all deposits equaled 10 percent of the purchase price. *Id.* at 18. And, if the Government approved a closing date more than 45 days after the date of award, an offeror was required to make any additional deposit so that the sum of all deposits equaled 25 percent of the purchase price. *Id.* at 18.

Several other provisions of the IFB are relevant to the present dispute. First, paragraph 3 of the IFB "invited, urged, and cautioned" bidders "to inspect the Property prior to submitting a bid." *Id.* at 9. Second, paragraph 5 of the IFB, titled "condition of property," stated as follows:

> The Property is offered for sale **"AS IS" AND "WHERE IS"** without representation or warranty, expressed or implied. The Purchaser, and Purchaser's successors and assigns, or any party-in-possession of the Property, or any part thereof, further

> acknowledges that the Government makes no representations or warranty concerning the title, zoning, character, condition, size, quantity, quality and state of repair of the Property. The Government makes no other agreement or promise to alter, improve, adapt or repair the Property not otherwise contained herein. Purchaser shall rely solely on its own due diligence and examination of the Property. Purchaser acknowledges that there will be no claims or any allowances or deductions upon grounds that the Property is not in condition or fit to be used for any purpose intended by the Purchaser after the conclusion of the auction. An "As Is, Where Is" provision will be included in the Quitclaim Deed and is provided in the Notices and Covenants section.

*Id.* at 9–10 (bolding in original).

The definitions section of the IFB further clarified the meaning of the phrase "As Is:"

> The term "As-Is" means that the Government is selling and the Bidders are offering to purchase the Property in whatever condition it presently exists, and that the Purchaser will accept the Property "with all faults," whether or not they could be ascertained by an inspection of the Property or review of any due diligence material available.

*Id.* at 7.

Additionally, paragraph 7 of the IFB described the "risk of loss" as follows:

> As of the date of conveyance of the Property, the Purchaser shall assume all obligations and liabilities of ownership to the Property including, without limitation, sole responsibility for the care and handling of the Property and all loss and/or damage related to the same (including, without limitation, the buildings and/or improvements located thereon), and no claim for any allowance or deduction upon such grounds will be considered after the Bid Opening Date.

*Id.* at 10.

Paragraph 9 of the IFB described the consequences of a default:

> Purchaser agrees that bids made to purchase the Property are binding offers and once accepted for contract by the Government, all deposits made by the Purchaser to register for the sale, subject to this IFB, become Earnest Money to the benefit, custody and accountability of the Government.

> In the event of (1) revocation of a bid after the conclusion of the bid opening, but prior to acceptance of the high bid by the Government, or (2) in the event of revocation of a bid after notice of acceptance, or (3) in the event of any default by the Purchaser in the performance of the contract of sale created by such acceptance, or (4) in the event of failure by the Purchaser to consummate the transaction, the Purchaser agrees that any Earnest Money and all deposits paid to the Government in any acceptable form, including credit card, together with any payments subsequently made on account, are subject to forfeit by the Purchaser to the Government at the option of the Government as damages for breach of contract, in which event the Purchaser shall be relieved from further liability.

*Id.* at 10–11.

Lastly, paragraph 10 of the IFB limited the Government's liability:

> If the Governments accepts a Bid and (1) the Government fails for any reason to perform its obligations as set forth herein; or (2) title does not transfer or vest in the Purchaser for any reason, although Purchaser is ready, willing, and able to close; or (3) any other contractual claim or cause of action hereafter accrues in favor of the Purchaser under the terms of this IFB, then, unless otherwise expressly provided in this IFB, the extent of the Government's liability to the Purchaser shall be strictly limited to all amounts of money the Purchaser has paid to the Government (without interest). Upon the refund to the Purchaser of such money (without interest), the Agreement of Sale shall be deemed terminated and of no further force and effect and the Government shall have no further liability to the Purchaser.

*Id.* at 11.

On September 7, 2016, plaintiff submitted a bid for Coastal Park of $3,100,000.01, together with the required $100,000 deposit. Am. Compl. ¶ 8, ECF No. 7; ECF No. 10-1 at 32. The next day, GSA accepted plaintiff's bid, which for some reason was notated as $3,100,000.00 (one penny less than the amount plaintiff submitted). ECF No. 10-1 at 34–35. Consistent with the IFB's 45-day schedule, closing was to occur on October 23, 2016. Am. Compl. ¶ 7.

4

On or about September 22, 2016, plaintiff paid an additional deposit of $210,000. *Id.* ¶ 9. Starting on October 8, 2016, Hurricane Matthew caused extensive property damage on the North Carolina coast. *Id.* ¶ 10. Coastal Park was one of the damaged properties. *Id.* ¶ 11.

Plaintiff asked GSA to extend the closing date. *Id.* ¶ 12. On October 21, 2016, GSA agreed to extend the closing date to October 30, 2016. *Id.* ¶ 13. In response to another request, GSA again agreed to extend the closing date to October 31, 2016. *Id.* ¶ 14. And, on October 31, 2016, GSA agreed to an additional extension, this time to November 7, 2016. *Id.* ¶ 15.

On or about November 2, 2016, plaintiff hired two property inspectors to assess the damage Hurricane Matthew caused to Coastal Park. *Id.* ¶ 17. Plaintiff sent their reports to GSA on November 6, 2016. *Id.*

On November 7, 2016, GSA informed plaintiff that he had two days to tender the full outstanding balance of the purchase price or he would forfeit his deposits. *Id.* ¶ 18. Plaintiff attempted to convince GSA that an adjustment in the purchase price was appropriate after the damage caused by Hurricane Matthew. *Id.* ¶ 25. On November 10, 2016, GSA sent plaintiff a letter that he was in default, the contract was void, and plaintiff had forfeited his deposit. *Id.* ¶ 19.

Prior to GSA cancelling the contract, plaintiff incurred various costs in anticipation of closing, including: $10,500 in title and survey charges, $12,300 in legal fees, $3,500 in appraisal services, $48,000 in mortgage broker fees, and $6,000 in miscellaneous expenses. *Id.* ¶¶ 39, 40. In addition, plaintiff spent $4,200 on the two inspectors he hired to examine the property after Hurricane Matthew hit the North Carolina coast. *Id.* ¶ 41.

On December 15, 2016, GSA sold Coastal Park to Coastal Park Townehomes LLC. *Id.* ¶ 36.

**b. Procedural Background**

On March 24, 2017, plaintiff (in his own name and on behalf of Coastal Park LLC) filed a complaint in this Court. ECF No. 1. Then, on May 8, 2017, plaintiff filed an amended complaint ("Am. Compl."). ECF No. 7.

Count I of the amended complaint alleges that the Government "was duty bound to repair any damage sustained by the property after September 9, 2016." *Id.* ¶ 46. Because the Government failed to repair the property and instead cancelled the contract, it is liable for $394,500. *Id.* ¶ 52.

Count II of the amended complaint alleges that the risk of loss to Coastal Park remained with the Government until closing. *Id.* ¶ 55. For this, the Government is liable for $394,500. *Id.* ¶ 57.

Count III of the amended complaint alleges that the Government is liable for the profits plaintiff expected to realize from the resale of Coastal Park. *Id.* ¶ 60. Plaintiff estimates those profits at $1,921,900. *Id.* ¶ 61.

Count IV of the amended complaint requests reasonable attorney's fees pursuant to the Equal Access to Justice Act. *Id.* ¶ 63.

On July 3, 2017, defendant filed a motion to partially dismiss ("Gov't Mot."), together with a copy of the IFB and plaintiff's bid. ECF Nos. 10, 10-1. On August 14, 2017, plaintiff filed a response ("Pl.'s Resp."), with supporting affidavits and documents. ECF Nos. 13-1–13-8. On August 14, 2017, defendant filed a reply ("Gov't Reply"). ECF No. 14. On October 11, 2017, the Court heard oral argument on the motion. ECF No. 17 ("Tr."). On May 3, 2019, this case was transferred to the undersigned. ECF No. 19.

## II.      DISCUSSION

Defendant's argument for partial dismissal of the amended complaint centers on paragraph 10 of the IFB, the limitation on damages. As stated above, paragraph 10 provides that, in a wide variety of circumstances, "the extent of the Government's liability to the Purchaser shall be strictly limited to all amounts of money the Purchaser has paid to the Government (without interest)." IFB at 11. Defendant argues that plaintiff may not recover more than the $310,000 in deposits he paid to the Government between September 8 and November 10, 2016. Gov't Mot. at 7–8. The Court must resolve two questions: (1) whether paragraph 10 applies to plaintiff's suit, and (2) whether paragraph 10 is enforceable.

### a.  Legal Standard

Rule 12(b)(6) permits a party to file a motion to dismiss for "failure to state a claim upon which relief can be granted." RCFC 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if true, would state a claim to relief that is plausible on its face." *Athey v. United States*, 908 F.3d 696, 705 (Fed. Cir. 2018) (internal quotations omitted). "The court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant." *Id.*

When interpreting a contract, "[w]e begin with the plain language." *McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). "[I]f the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning,' and the court may not resort to extrinsic evidence to interpret them." *Id.* (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)).

**b.   The Clause Limiting the Government's Liability Applies to This Case**

Paragraph 10 applies to the allegations in the amended complaint. Paragraph 10

contemplates a situation where "the Government accepts a Bid and (1) the Government fails for

any reason to perform its obligations as set forth herein; or (2) title does not transfer or vest in

the Purchaser for any reason, although Purchaser is ready, willing, and able to close; or (3) any

other contractual claim or cause of action hereafter accrues in favor of the Purchaser under the

terms of this IFB." IFB at 11. The Court does not need to decide whether plaintiff was ready,

willing, and able to close, because the third clause of paragraph 10 contemplates "any other

contractual claim or cause of action in favor of the Purchaser." IFB at 11. This catch-all language

encompasses Counts I, II, and III of the amended complaint, each of which alleges that the

Government wrongfully cancelled its contract with plaintiff. Am. Compl. ¶¶ 45–61.

**c.   The Clause Limiting the Government's Liability is Enforceable**

The next question the Court must resolve is whether paragraph 10 is enforceable in these

circumstances. The leading case on the enforceability of damage-limitations clauses is *Freedman*

*v. United States*, 320 F.2d 359 (Ct. Cl. 1963).

In *Freedman*, in 1957, the Air Force issued a call for sealed bids to purchase surplus

tanks in England. *Id.* at 360. The contract provided that "Property will be removed by rail from

Cambridge at British Army expense to rail-head nearest to the Contractors site." *Id.* A bidder,

who later became the plaintiff, asked the officer in charge if the Air Force would deliver the

tanks to a rail depot in mainland Europe. *Id.* The officer said, "that's perfectly all right; go ahead

and do it." *Id.*

8

The contract also included a clause limiting damages as follows:

> In any case where liability of the Government to the Purchaser has been established, the extreme measure of the Government's liability shall not, in any event, exceed refund of the purchase price or such portion thereof as the Government may have received.

*Id.* at 362.

The plaintiff submitted a bid and was awarded the contract. *Id.* at 361. Thereafter, the Air Force realized that the diesel engines in its tanks were valuable and did not have to be demilitarized. *Id.* The plaintiff was then told that he needed a British export license to sell the tanks in other countries. *Id.* But, the Air Force refused to help the plaintiff obtain any such license, and later unilaterally cancelled the contract award. *Id.*

The plaintiff offered to remove the diesel engines from the tanks and ship them back to England if the Air Force would reinstate the contract. *Id.* at 361–62. The Air Force accepted this arrangement and rescinded its earlier cancellation. *Id.* at 362. When the plaintiff insisted that the Air Force pay for shipment of the tanks to mainland Europe so that he could remove the diesel engines, the Air Force refused and reinstated the cancellation. *Id.* It subsequently sold the tanks to another buyer at a lower price. *Id.*

The plaintiff sued. After holding that the Air Force had breached its contract with the plaintiff, the Court addressed the clause limiting damages. *Id.* at 366. Such a clause, the Court held, "does play a valid part where the Government cancels the sale for such good cause as a newly-discovered need for the property or a significant mistake as to the property offered for sale." *Id.* But, the Government may not rely on the clause "without such good reason, because it disagrees with the contractor over the meaning of some provision of the agreement." *Id.* "To read the clause in that unlimited fashion—excusing all damages for any type of breach—would come

close to (if not reach) the pit of voidness; the Government would in effect promise nothing although the other party would supposedly be bound." *Id.*

Speaking more broadly, the Court held that "general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches, especially willful defaults, causing important loss to the contractor." *Id.* A limit on damages may not cover "a significant, willful, and unjustified breach, . . . destroying the heart of the plaintiff's agreement and bringing grave loss." *Id.*

In the years since *Freedman*, courts have quoted the decision at varying levels of generality to stand for a wide variety of propositions. For example, in *Hoel-Steffen Const. Co. v. United States*, 684 F.2d 843 (Ct. Cl. 1982), the Court held that damage-limiting clauses are "subject to strict construction." *Id.* at 852; *see also New Valley Corp. v. United States*, 119 F.3d 1576, 1584 (Fed. Cir. 1997) (citing *Freedman* for the rule that "exculpatory provision[s]" must be construed "narrowly and strictly"); *Spectrum Scis. v. United States*, 84 Fed. Cl. 716, 743 (Fed. Cl. 2008) (citing *Freedman* for the rule that "clauses limiting damages are construed against the party invoking their protection"). In other cases, courts have held that *Freedman* articulated a special rule that only applies to the sale of military surplus when certain conditions are present. *See, e.g.*, *Benjamin v. United States*, 348 F.2d 502, 516 (Ct. Cl. 1965); *C.J. Betters Corp. v. United States*, 25 Cl. Ct. 674, 676 (Cl. Ct. 1992). In *Am. Satellite Co. v. United States*, 34 Fed. Cl. 468 (Fed. Cl. 1995), the Court held that damage-limitation clauses are unenforceable in any case of willful breach by the Government. *See id.* at 480.

In this Court's view, however, the best reading of *Freedman* is that a clause limiting damages is unenforceable where there has been "a significant, willful, and unjustified breach, . . . destroying the heart of the plaintiff's agreement and bringing grave loss." 320 F.2d at 366. This

interpretation is consistent with subsequent decisions of the Federal Circuit, because it provides some criteria for interpreting such clauses "narrowly and strictly." *New Valley*, 119 F.3d at 1584. To argue that a clause limiting damages is unenforceable, a plaintiff must therefore show that the Government's breach was (1) significant, (2) willful, and (3) unjustified.

Here, the amended complaint alleges facts that, if proven, would show the Government's breach was significant. The Government cancelled its contract with plaintiff after plaintiff failed to provide the requested additional deposit before the Government's November 9, 2016 deadline. Am. Compl. ¶¶ 18–19. Cancelling a contract in its entirety goes to the "heart of the . . . agreement and bring[s] great loss." *Freedman*, 320 F.2d at 366.

The amended complaint also alleges facts that, if proven, would show the Government's breach was willful. When plaintiff failed to convey the outstanding balance of the purchase price at closing, the Government chose to cancel the contract rather than provide another extension. Am. Compl. ¶¶ 19, 33. There is no suggestion in the amended complaint or motion to partially dismiss that the Government's conduct was inadvertent. *See generally* Am. Compl.; Gov't Mot.

Lastly, the amended complaint does not allege facts that, if proven, would be sufficient to show the Government's behavior was unjustified. Plaintiff's allegation of bad faith rests on the explicit premise that "[t]he Risk of Loss for [] damages to the Property occurring after September 8, 2016 but prior to conveyance of the deed were the responsibility of the Defendant." Am. Compl. ¶ 23. That premise is incorrect.

If the IFB contained only a statement that the Property was offered for sale "AS IS," that would present a close call. But, the IFB contained many other statements disclaiming the Government's obligation to maintain the property prior to closing. The clause titled "Condition of Property" disclaimed any intent on the Government's part to make "representations or

warranty concerning the title, zoning, character, condition, size, quantity, quality and state of repair of the Property." IFB at 9. And, the Government made "no other agreement or promise to alter, improve, adapt or repair the Property not otherwise contained herein." *Id.* Read together, the plain language of these provisions disclaims any default risk of loss rule that might otherwise protect a buyer in the event of unexpected damage. *Cf.* N.C. Gen. Stat. Ann. § 39-39 (West 2018) (providing for rescission when a property is destroyed prior to closing through no fault of the purchaser).

Paragraph 7 of the IFB does not raise an inference that the risk of loss remained on the seller until the property was conveyed to the buyer. Paragraph 7 states: "As of the date of conveyance of the Property, the Purchaser shall assume all obligations and liabilities of ownership to the Property." IFB at 10. This provision does raise an inference that—prior to the date of conveyance—the Government was responsible for the "obligations and liabilities of ownership." *Id.* But, it does not follow that one of those obligations and liabilities was to repair any damage Hurricane Matthew did to Coastal Park prior to the closing date. In fact, the clear language of other provisions disclaiming any representations and warranties related to the condition of the property suggest that the aforementioned "obligations and liabilities of ownership" refer to, for example, an owner's legal relations to third-parties, such as guests and trespassers, and not to the legal relationship between buyer and seller.

Paragraph 16 of the IFB likewise fails to advance Plaintiff's case. Paragraph 16 of the IFB states: "Except for delayed closing caused solely by the Government or forced [sic] majeure events, any change to the closing date . . . is subject to written approval by the Government. The Government reserves the right to refuse a Purchaser's request for extension of closing." IFB at 12. Even if Hurricane Matthew qualifies as a force majeure event under paragraph 16, Plaintiff

does not allege that the Hurricane itself prevented the parties from closing on November 9, 2016. *See generally* Am. Compl. Rather, Plaintiff alleges that the Government was not ready, willing, and able to close on that date "due to the unresolved property damage issues." *Id.* ¶ 32. As explained above, this contention rests on the incorrect assumption that the Government was obligated to repair any damages caused by the Hurricane prior to closing. Because Plaintiff does not plausibly allege that Hurricane Matthew prevented the parties from closing on November 9, 2016, paragraph 16 does not apply.

Plaintiff argues that he was entitled to negotiate a reduced price after Hurricane Matthew damaged Coastal Park. *Id.* ¶ 25. In fact, the IFB repeatedly emphasized that plaintiff had no such right, stating: "Purchaser acknowledges that there will be no claims or any allowances or deductions upon grounds that the Property is not in condition or fit to be used for any purpose intended by the Purchaser after the conclusion of the auction." IFB at 9–10; *see also id.* at 10 ("[N]o claim for any allowance or deduction upon [grounds of loss and/or damage] will be considered after the Bid Opening Date").

Plaintiff also argues that the Government's offer to extend the closing date from November 7 to November 9, 2016 in exchange for the full outstanding balance on the property evidences bad faith. Am. Compl. ¶ 18. Plaintiff is wrong for two reasons. First, the Government had already twice extended the closing date provided for by the contract, even though it had the right to refuse both extensions. *Compare id.* ¶¶ 12–14 *with* IFB at 12 ("The Government reserves the right to refuse a Purchaser's request for extension of closing."). Second, the Government had the right to demand an additional deposit from plaintiff as a condition of extending the closing date past the original forty-five-day period. IFB at 18. The Government granted plaintiff's first two extension requests without requiring any such deposit. The fact that the Government then

demanded additional earnest money as a condition of approving a third extension does not evidence bad faith under these circumstances.

Finally, the cases plaintiff cites are inapposite. In *Rivera Agredano v. United States*, 70 Fed. Cl. 564 (Fed. Cl. 2006), for example, the Court determined that—in the foreclosure sale of a vehicle—an "AS IS" clause did not encompass drugs hidden out of sight inside that vehicle. *Id.* at 572. That holding does not help resolve this case for at least two reasons. First, *Rivera Agredano* did not address a clause that purported to limit the Government's liability, it only addressed the meaning of an "AS IS" clause in the context of a car. Second, plaintiff does not allege that Hurricane Matthew introduced any hidden foreign object to Coastal Park that would be analogous to drugs hidden inside a vehicle.

Plaintiff invokes the implied covenant of good faith and fair dealing, which "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). But, the implied covenant may not impose "a duty that is inconsistent with" the contract. *Id.* at 1306. Because the plain language of the IFB places the risk of loss in these circumstances on the buyer, any application of the implied covenant that would place that same risk on the seller is inconsistent with the contract and therefore untenable.

For these reasons, plaintiff has not alleged facts that, if proven, would show that the Government's behavior was unjustified. Because the Government did not engage in unjustified behavior, the clause in the IFB that limits the Government's liability to "all amounts of money the Purchaser has paid to the Government" is enforceable. At this stage, the Court expresses no

view as to whether Plaintiff may ultimately be entitled to recover some or all of the $310,000 paid prior to cancellation of the contract.

## III.   CONCLUSION

For the above stated reasons, the following is hereby ordered:

1.   Defendant's motion to partially dismiss is **GRANTED**.

2.   Counts I, II, and III of plaintiff's amended complaint are **DISMISSED** to the extent those Counts assert a claim for damages that exceeds all amounts of money plaintiff paid to the Government, *i.e.*, $310,000. Plaintiff's claim for attorney's fees in Count IV of the amended complaint is **DENIED** at this time.

3.   The parties shall file a status report concerning further proceedings on or before June 14, 2019.

Because there is no just reason for delay, the Clerk is directed to enter judgment on the dismissed portion of plaintiff's claims in accordance with RCFC 54(b). No costs.

**IT IS SO ORDERED.**

s/ Bohdan A. Futey
BOHDAN A. FUTEY
Senior Judge